UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN THUET and MICHELLE BRUMFIELD, | ) | |
| | ) | |
| Plaintiffs, | ) | 20 C 1369 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| CHICAGO PUBLIC SCHOOLS, JANICE JACKSON, in her official capacity as Chief Executive Officer and in her individual capacity, MICHAEL PASSMAN, in his official capacity as Chief Communications Officer for the Chicago Public Schools and in his individual capacity, and LAURA LeMONE, in her official capacity as Network Chief, District 14, and in her individual capacity, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**M<small>EMORANDUM</small> O<small>PINION AND</small> O<small>RDER</small>**

In this suit against the Chicago Board of Education and Chicago Public Schools ("CPS") officials Janice Jackson, Michael Passman, and Laura LeMone, John Thuet and Michelle Brumfield bring claims under 42 U.S.C. § 1983 and state law in connection with their firing from CPS. Doc. 1. (Although the complaint names CPS as the entity defendant, both sides agree that the Board of Education for the City of Chicago is the correct entity defendant. Doc. 20 at 1 n.1; Doc. 23 at 15.) Defendants move under Civil Rule 12(b)(6) to dismiss the complaint. Doc. 20. The motion is granted as to Plaintiffs' state law defamation claim against the Board and otherwise is denied.

**Background**

In resolving a Rule 12(b)(6) motion, the court assumes the truth of the operative complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider

1

"documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Plaintiffs' brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (internal quotation marks omitted). The facts are set forth as favorably to Plaintiffs as those materials allow. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth the facts at the pleading stage, the court does not vouch for their accuracy. *See Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

The Board is the public agency that administers CPS. Doc. 1 at ¶ 6. Plaintiffs worked for CPS for years, as teachers and administrators. *Id.* at ¶¶ 14-15. In August 2019, Lincoln Park High School's Local School Council offered Thuet a one-year position as Interim Principal for the 2019-2020 school year. *Id.* at ¶ 16. Thuet began that month, and soon thereafter he hired Brumfield as an Assistant Principal. *Id.* at ¶ 17. Lincoln Park High School is within Network 14 of CPS. *Id.* at ¶ 19.

On January 31, 2020, Plaintiffs received an email meeting invitation from LeMone, the Chief of Network 14. *Id.* at ¶¶ 8, 19. The meeting was scheduled that afternoon at CPS headquarters. *Id.* at ¶ 19. Plaintiffs were separated when they arrived. *Id.* at ¶ 20. Thuet met with a CPS administrator, a CPS in-house lawyer, and LeMone. *Id.* at ¶ 21. LeMone gave Thuet a termination letter, which stated that "[a] decision ha[d] been made to terminate [his] employment effective immediately," and that "[p]ursuant to the attached letter, [he was] not eligible for re-employment with the Chicago Public Schools." *Id.* at ¶¶ 21-22. The attached letter stated that "pursuant to the applicable Chief Executive Officer's Guidelines regarding do not hire ('DNH') status, [Thuet was] no longer eligible for hire in the Chicago Public Schools

('CPS'), and a DNH ha[d] been placed on [his] file" because of his "overall performance and misconduct record." *Id*. at ¶ 23. The letter added that Thuet "may petition the Chief Executive Officer to remove that [DNH] designation." *Ibid*. Brumfield met with another CPS administrator, who handed her a termination letter. *Id*. at ¶¶ 24-25. Brumfield's letter used the same language as Thuet's, stating that she was terminated effective immediately and had been placed on the DNH list, with the same appeal process. *Id*. at ¶¶ 25-26. Both sets of letters cited to codes in a "Misconduct/Discipline Matrix," but did not identify the actions by Plaintiffs that qualified as misconduct under those codes. *Id*. at ¶¶ 23, 26, 28.

Jackson, CPS's Chief Executive Officer ("CEO"), was ultimately responsible for the decisions to terminate Plaintiffs and put them on the DNH list. *Id*. at ¶¶ 7, 27. The terminations and DNH placements were made without notice or a hearing. *Id*. at ¶¶ 28-29. Plaintiffs had not previously been provided with details of their alleged misconduct, and they were not provided the opportunity to challenge their terminations. *Ibid*.

On February 11, 2020, Defendants met with Lincoln Park High School's Local School Council in a "closed-door meeting." *Id*. at ¶ 54. Defendants agreed to provide information regarding Plaintiffs' termination on the condition that the Local School Council agree to keep the information confidential. *Ibid*.

Shortly after that meeting, Defendants made a series of false and stigmatizing public statements about Plaintiffs. *Id*. at ¶¶ 31-34, 55-56. Defendants either knew that the statements were false or were grossly negligent in not knowing, and they acted maliciously in making them. *Id*. at ¶ 58. As reported in a February 13, 2020 article, CPS officials told the *Chicago Sun-Times* that "administrators minimized sexual misconduct allegations, didn't protect whistleblowers or alleged victims from bullying and retaliation, withheld key evidence from investigators, … lied

3

to families about the status of investigations," and made "troubling decisions." *Id*. at ¶¶ 32-33, 55. The article quoted Passman, CPS's Chief Communications Officer, as saying that "Administrators at Lincoln Park High School failed to promote the best interests of their students and endangered victims who were counting on their support," that "[t]he personnel actions … were necessary to ensure a school environment that prioritizes the safety of all students," and that "[t]oo many adults in the school community are needlessly creating an environment that is perpetuating the life-altering harm done to multiple students." *Id*. at ¶¶ 9, 33. Those statements have damaged Plaintiffs' professional reputations and will make it extremely difficult for them to secure future employment as educators. *Id*. at ¶¶ 38-39.

## Discussion

The complaint sets forth a procedural due process claim under the Fourteenth Amendment and Illinois common law claims for defamation and intentional infliction of emotional distress. Defendants move to dismiss all three claims.

### I. Procedural Due Process Claim

The procedural due process claim alleges that Defendants deprived Plaintiffs—without providing notice, a hearing, or any meaningful opportunity to contest the allegations against them—of their liberty interest in pursuing their chosen occupation. Doc. 1 at ¶¶ 40-52. To state a due process claim for deprivation of a liberty interest, Plaintiffs must allege: (1) "that [they] had a cognizable liberty interest under the Fourteenth Amendment"; (2) "that [they were] deprived of that liberty interest"; and (3) "that the deprivation was without due process." *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013). And because they pursue an occupational liberty claim, Plaintiffs also must satisfy the "stigma plus" test, which requires that they allege: (1) "damage to [their] good name, reputation, honor, and integrity"; and (2) "the inability to pursue the occupation of [their] choice because of the label." *Id*. at 878.

4

Defendants contend that Plaintiffs do not satisfy the "stigma plus" test. Doc. 20 at 11-13; Doc. 26 at 7-10. But the complaint plausibly alleges that Plaintiffs' placement on the DNH list—together with the press statements suggesting that they minimized sexual misconduct allegations, failed to protect whistleblowers, endangered victims, withheld key evidence, lied to families, and perpetuated life-altering harm to multiple students—"had the effect of blacklisting [them] from employment in comparable jobs." *Townsend v. Vallas*, 256 F.3d 661, 670 (7th Cir. 2001) (internal quotation marks omitted). It follows that Plaintiffs, at least on the pleadings, satisfy the "stigma plus" test. *See Ratliff v. City of Milwaukee*, 795 F.2d 612, 626 (7th Cir. 1986) ("Ratliff was charged with unsatisfactory performance and lack of ability, but the specifics were so devastating that it is unrealistic to believe that she could pursue a career in law enforcement, if the reasons were publicized. More importantly, Ratliff was also charged with untruthfulness, failure to obey orders, neglect of duty, and insubordination. Such charges … indicate that she is unfit to serve as a law enforcement officer in any capacity. … And, if such charges were published, Ratliff had a due process right to a hearing at which she could attempt to refute the charges and publicly clear her name.").

Defendants also contend that Plaintiffs do not allege that Jackson, Passman, and LeMone were personally involved in any due process deprivation. Doc. 20 at 6-8. "Individual liability pursuant to § 1983 requires personal involvement in the alleged constitutional deprivation." *Estate of Perry v. Wenzel*, 872 F.3d 439, 459 (7th Cir. 2017) (internal quotation marks omitted); *see also Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) ("The plaintiff must demonstrate a causal connection between (1) the sued officials and (2) the alleged misconduct."). In their opposition brief, Plaintiffs state that Passman disseminated the statements to the media and that LeMone and Jackson participated in the dissemination. Doc. 23 at 13-14. Those

allegations, which are consistent with the pleadings, *see Phillips*, 714 F.3d at 1020, sufficiently allege that those defendants participated personally in the constitutional deprivation.

Defendants next contend that Jackson, Passman, and LeMone are entitled to qualified immunity because Plaintiffs' right to pre-termination notice and a hearing was not clearly established at the time they were fired and placed on the DNH list. Doc. 20 at 13-16. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. … A state official is protected by qualified immunity unless the plaintiff shows: (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Reed v. Palmer*, 906 F.3d 540, 546 (7th Cir. 2018) (internal quotation marks omitted). "Because a qualified immunity defense so closely depends on the facts of the case, a complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds." *Id.* at 548 (internal quotation marks omitted); *see also Tamayo v. Blagojevich*, 526 F.3d 1074, 1090 (7th Cir. 2008) ("[W]e have cautioned that the rule that qualified immunity must be resolved at the earliest possible stage must be tempered by the notice pleading requirements of Rule 8.") (citations omitted). This general rule is not ironclad, as there is "tension" at the pleading stage "between developing the requisite facts for a well-informed qualified immunity determination and preserving a government official's right to avoid the burdens of pretrial matters, including discovery." *Reed*, 906 F.3d at 548; *see also Gill v. City of Milwaukee*, 850 F.3d 335, 340-42 (7th Cir. 2017) (affirming a dismissal under Rule 12(c) on qualified immunity grounds). The upshot is that a defendant asserting qualified immunity at the pleading stage is subject "to a more challenging standard of review than would apply on summary judgment," and "it is the

defendant's conduct as alleged in the complaint that is scrutinized for objective legal reasonableness." *Reed*, 906 F.3d at 549 (emphasis omitted) (internal quotation marks omitted).

There is no basis for departing from the general rule here. Plaintiffs allege that Defendants—without notice or a hearing—terminated them, placed them on the DNH list, and made false and stigmatizing statements associated with their termination, thus infringing their occupational liberty due process rights. Doc. 1 at ¶¶ 40-46. Citing *McMath v. City of Gary*, 976 F.2d 1026 (7th Cir. 1992), Plaintiffs contend that the law was clearly established before January 2020 that such conduct violates due process. Doc. 23 at 12. They are correct. Addressing a qualified immunity defense, *McMath* held that "it was clearly established"—even back in 1992—"that when the government terminates a public employee and makes false or substantially inaccurate public charges or statements that stigmatize the employee, that employee's liberty interest is implicated" and the employee has a "clearly established right to a name clearing hearing." 976 F.2d at 1031-32. Although Defendants accurately observe that the particular facts of *McMath* differ from those here, Doc. 26 at 11, the principle set forth in *McMath* nonetheless covers their alleged conduct with the level of specificity sufficient to defeat their qualified immunity defense at the pleading stage.

The Board can be held liable for the alleged procedural due process violation only on a *Monell* theory. *See Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) ("A municipality may not be held liable under § 1983 based on a theory of respondeat superior or vicarious liability. A municipality only may be held liable under § 1983 for constitutional violations caused by the municipality itself through its own policy or custom.") (citation omitted) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). To state a *Monell* claim, the plaintiff must allege facts sufficient to show that a municipal employee's unconstitutional act was caused by: "(1) an

7

express [municipal] policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002) (internal quotation marks omitted); *see also Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (en banc) ("The critical question under *Monell* … is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents."). In addition to showing that the municipality acted culpably in one of those three ways, the plaintiff must allege causation, meaning that the municipality, "through its deliberate conduct, … was the moving force behind the injury alleged." *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997) (emphasis and internal quotation marks omitted).

Plaintiffs pursue the final policymaker variant of *Monell* liability, arguing that Jackson had final policymaking authority and that she exercised that authority in deciding to terminate them and place them on the DNH list. Doc. 23 at 15-16. Determining "who legally constitutes a final policymaker" is a question of state law. *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 629 (7th Cir. 2009). "Final policymaking authority may be granted directly by statute or delegated or ratified by an official having policymaking authority." *Kujawski v. Bd. of Comm'rs*, 183 F.3d 734, 737 (7th Cir. 1999). A person has final policymaking authority for employment purposes if she has authority to set policy for hiring and firing. *See id.* at 739 ("There must be a delegation of authority to set policy for hiring and firing, not a delegation of only the final authority to hire and fire."). "[T]he mere unreviewed discretion to make hiring and firing decisions does not amount to policymaking authority. There must be a delegation of authority to

8

set policy for hiring and firing, not a delegation of only the final authority to hire and fire." *Valentino v. Vill. of South Chicago Heights*, 575 F.3d 664, 676 (7th Cir. 2009) (internal quotation marks omitted).

Defendants argue that Jackson was not a final policymaker because she simply made employment decisions and did not set policy for hiring and firing. Doc. 26 at 2. But the letters given to Plaintiffs referenced "the applicable Chief Executive Officer's [*i.e.*, Jackson's] Guidelines regarding [DNH] status" and informed them they could petition Jackson to remove the DNH designation. Doc. 1 at ¶¶ 23, 26. The reference to the CEO guidelines yields a permissible inference that Jackson not only made hiring and firing decisions in individual cases, but also set policy for termination and DNH decisions. Plaintiffs therefore state a *Monell* claim against the Board under a final policymaking authority theory. *See Kristofek v. Vill. of Orland Hills*, 712 F.3d 979, 987 (7th Cir. 2013) (holding that the plaintiff's allegation that a police chief "was fully in charge of the police department and that his firing decisions were not reviewed" sufficed to state a claim that he had final policymaking authority over hiring and firing given the plausible inference that he "essentially had a *de facto* policy" regarding hiring and firing).

## II.     State Law Claims

Defendants seek dismissal of Plaintiffs' defamation claim against the Board on the ground that the Board is immune from liability under Illinois law. Doc. 20 at 16-17. Plaintiffs concede the point, Doc. 23 at 19 n.1, so the defamation claim against the Board is dismissed.

There is no need to run to ground Defendants' other arguments for dismissing the state law claims. Plaintiffs' procedural due process claim will go forward against all four defendants, and the scope of discovery will be the same regardless of whether the state law claims proceed or are dismissed. Moreover, Defendants' grounds for dismissing the state law claims raise difficult questions regarding the innocent construction rule, common law absolute immunity, and

immunity under the Illinois Tort Immunity Act, 745 ILCS 10/1-101 *et seq.*, that are better resolved on a more complete record. Accordingly, Defendants' motion to dismiss Plaintiffs' state law claims (other than the defamation claim against the Board) is denied.

## Conclusion

Defendants' motion to dismiss is granted in part and denied in part. Plaintiffs' defamation claim against the Board is dismissed with prejudice. Defendants shall answer the surviving portions of the complaint by October 8, 2020.

September 24, 2020

_____
United States District Judge