UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN THUET and MICHELLE BRUMFIELD, | ) | |
| | ) | |
| Plaintiffs, | ) | 20 C 1369 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| BOARD OF EDUCATION OF THE CITY OF | ) | |
| CHICAGO, JANICE JACKSON, in her official capacity | ) | |
| as Chief Executive Officer and in her individual | ) | |
| capacity, MICHAEL PASSMAN, in his official capacity | ) | |
| as Chief Communications Officer and in his individual | ) | |
| capacity, and LAURA LeMONE, in her official capacity | ) | |
| as Network Chief, District 14, and in her individual | ) | |
| capacity, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Former Chicago Public Schools ("CPS") employees John Thuet and Michelle Brumfield claim that the Chicago Board of Education and CPS officials Dr. Janice Jackson, Michael Passman, and Laura LeMone violated 42 U.S.C. § 1983 and state law in connection with their terminations from CPS. Doc. 1. Early in the litigation, the court dismissed with prejudice Plaintiffs' state law defamation claim against the Board. Docs. 38-39 (reported at 2020 WL 5702195 (N.D. Ill. Sep. 24, 2020)). With discovery completed and a jury trial set for the week of November 7, 2022, Doc. 101, Defendants move for summary judgment on Plaintiffs' remaining claims, Doc. 109. The motion is granted in part and denied in part.

**Background**

The court recites the facts as favorably to Plaintiffs as the record and Local Rule 56.1 allow. *See Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). At this

juncture, the court must assume the truth of those facts, but does not vouch for them. *See Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 633 (7th Cir. 2019).

### A.    The Pertinent Incidents and Plaintiffs' Responses

In August 2019, John Thuet and Michelle Brumfield began working as the interim principal and assistant principal, respectively, of Lincoln Park High School.  Doc. 134 at ¶ 1. Patrice Gordon, the head coach of the boys' basketball team, was responsible for obtaining the school's approval for the team's overnight and out-of-state trips.  Doc. 147 ¶¶ 1-2; Doc. 130-1 at 44 (163:17-19).  Brumfield would usually help Gordon gather the necessary paperwork, and she would then enter the pertinent information into the school's scheduling system for review and approval.  Doc. 130-1 at 44 (163:17-21).  CPS officials (but not Thuet or Brumfield) would then approve or deny the trip request.  *Id*. at 44 (163:22-164:4); Doc. 134 at ¶ 11.

On December 12, 2019, Gordon emailed Thuet and Brumfield a request for the team to travel to a basketball tournament in Detroit, Michigan, from December 27 through 29.  Doc. 134 at ¶ 14.  The request lacked the paperwork necessary for Brumfield to submit it for approval. *Ibid*.; Doc. 147 at ¶ 7.  Brumfield was frustrated, as Gordon had recently failed to provide the information necessary for a tournament in Florida, resulting in the team being unable to attend. Doc. 134 at ¶ 13; Doc. 147 at ¶ 7.  Brumfield attempted to follow up with Gordon to gather the necessary paperwork for the Detroit trip, but Gordon did not respond.  Doc. 147 at ¶ 7. Consequently, the trip was not approved.  *Id*. at ¶ 8; Doc. 134 at ¶ 13.

Despite not receiving approval—and unbeknownst to Thuet and Brumfield—Gordon took the boys' basketball team to the Detroit tournament.  Doc. 130-1 at 53 (198:8-10); Doc. 130-2 at 31 (113:15-21); Doc. 147 at ¶ 8.  On the trip, one player clandestinely filmed a consensual sexual encounter with a female classmate who was the team's student manager.

Doc. 134 at ¶ 44; Doc. 147 at ¶ 9. The player showed the video to several of his teammates. Doc. 147 at ¶ 9.

The fathers of two other players, C.T. and M.M., learned about this incident. *Id*. at ¶ 10; Doc. 134 at ¶ 20. In the version of the story the fathers had heard, three players filmed themselves having sex with the student manager. Doc. 134 at ¶ 21. The fathers were disturbed, and on December 31 they communicated with Thuet via phone and email. Doc. 147 at ¶ 11. That day, Thuet apprised his direct supervisor—Laura LeMone, CPS's Chief of Schools—of the situation and explained that he had not previously been aware of the Detroit trip. *Id*. at ¶ 12; Doc. 134 at ¶ 5. Thuet also apprised Brumfield and John Johnson, the high school's Dean of Students, of the allegations. Doc. 147 at ¶ 12.

On January 2, 2020, Thuet met with C.T.'s and M.M.'s fathers at a coffee shop. *Id*. at ¶ 13; Doc. 134 at ¶ 22. Thuet told the fathers that the school had not approved the Detroit trip, and he assured them that he would try to keep their identities confidential so that C.T. and M.M. would not face retaliation from other students. Doc. 147 at ¶ 13. After the meeting, Thuet contacted the Office of Student Protection ("OSP") to relay the fathers' allegations. *Id*. at ¶ 14. OSP instructed Thuet to create safety plans for the four students allegedly involved in the sexual incident, and he did so with the help of Johnson and OSP personnel. *Ibid*. Thuet did not create safety plans for C.T. and M.M., as OSP had not directed him to do so. *Id*. at ¶ 16; Doc. 134 at ¶ 33.

Despite C.T.'s and M.M.'s desire to remain anonymous, their teammates somehow learned about their fathers' communications with the school. Doc. 134 at ¶ 29; Doc. 147 at ¶ 19. C.T. and M.M. began to experience harassment and intimidation from their teammates, including via text messages. Doc. 134 at ¶¶ 29-30. Then, at a team meeting, a coach brought together C.T.

and one of the harassers—the student who had recorded the video—and told them to sort out their differences. *Id*. at ¶ 38; Doc. 147 at ¶ 19.

On January 9, C.T.'s father told Thuet about the team meeting. Doc. 147 at ¶ 19. On January 10, C.T.'s father sent Thuet copies of threatening texts that C.T. had received from his teammates. *Id*. at ¶ 20; Doc. 134 at ¶ 30. Thuet delegated to Johnson the responsibility of handling the texts and forwarded them to him with the intent that he would create an incident report. Doc. 134 at ¶ 30; Doc. 147 at ¶ 21. Having misunderstood Thuet's intent, Johnson did not create an incident report but instead spoke with C.T. and M.M. regarding the texts. Doc. 134 at ¶ 30; Doc. 147 at ¶ 21. On January 16, Thuet forwarded the texts to the OSP investigator who had been investigating the Detroit incident. Doc. 134 at ¶ 25; Doc. 147 at ¶ 21.

At around the same time, an unrelated incident regarding the girls' basketball team came to light. Doc. 147 at ¶ 24 n.3. On January 17, the head coach of the girls' team sent a message to C.P., a player, stating: "I heard you were crying that practice got canceled [*sic*]. … so I am going to come up with a individual [*sic*] practice for you [thumbs-up emoji] don't worry kid I got you [winking face emoji]." *Id*. at ¶ 24. The text disturbed C.P.'s mother, who reported it to the school's Office of Inspector General ("OIG"). *Ibid*.; Doc. 134 at ¶ 46.

On January 22, OIG informed Thuet and Brumfield of the matter, told them that it would investigate, and specifically directed them not to investigate the matter themselves. Doc. 134 at ¶ 47. But OIG also told Thuet to interview C.P. so that he could gather information for an incident report and inform C.P. of the school resources available to her. *Ibid*.; Doc. 147 at ¶ 24. Thuet delegated those responsibilities to Brumfield, who interviewed C.P. in her office on January 23. Doc. 134 at ¶ 50; Doc. 147 at ¶ 25. At the interview, C.P. explained that her coach's text had bothered her mother but not her; she also said that she was okay and did not

need anything. Doc. 147 at ¶ 25. The interview occurred without C.P.'s parents' permission, which Defendants claim violated school rules. Doc. 134 at ¶ 48.

Meanwhile, on January 29, C.T.'s father emailed Dr. Janice Jackson—CPS's Chief Executive Officer—about the harassment C.T. had endured. *Id*. at ¶ 39. C.T.'s father explained that C.T. had been outed as the source of reports about the Detroit trip, leading to retaliation from his teammates. *Ibid*. As a result, the email explained, C.T. was depressed and considering transferring high schools. *Ibid*. Dr. Jackson asked CPS's Chief Education Officer, LaTanya McDade, to follow up with C.T.'s and M.M.'s parents. *Id*. at ¶ 40. McDade did so, and the two fathers communicated their concerns about ongoing harassment and intimidation. *Ibid*.

The next day, January 30, CPS investigators met with Thuet regarding the Detroit incident and its aftermath. *Id*. at ¶ 41. Thuet explained that he had not known about the trip beforehand and that Johnson had been dealing with the harassment of C.T. *Ibid*. During the meeting, Thuet called Brumfield, who likewise explained that she had not known about the Detroit trip until after it had occurred. *Ibid*.

### B. Plaintiffs' Terminations and CPS's Public Statements

Dr. Jackson concluded that Plaintiffs had harmed C.T. by inadequately reporting the harassment and intimidation he was experiencing. *Id*. at ¶ 43. Dr. Jackson also concluded that Plaintiffs' inaction had harmed the student manager filmed on the Detroit trip, *id*. at ¶ 44, and that Brumfield had endangered C.P. by interviewing her about her coach's text message, *id*. at ¶ 53.

On January 31, Dr. Jackson terminated Thuet and Brumfield and designated both "Do Not Hire." *Id*. at ¶¶ 55-56. ("Do Not Hire" is an internal designation that precludes the designee from obtaining a position with CPS. *Id*. at ¶ 56; Docs. 116-5, 116-6.) That day, LeMone sent a

letter to the school's parents reporting that Thuet and Brumfield had been removed.  Doc. 116-7; Doc. 134 at ¶ 65.  The letter stated that "we expect our school leaders and staff to prioritize the safety and security of all students and we have zero tolerance for any behavior that compromises the wellbeing of our students," and invited parents to attend a February 3 meeting to discuss "the school leadership change and transition plans."  Doc. 116-7 at 2.

At the February 3 meeting, LeMone and other CPS officials presented a slide deck— which Dr. Jackson had approved—summarizing the events described above.  Doc. 116-8; Doc. 134 at ¶ 68.  While the January 31 letter identified Thuet and Brumfield (as well as Johnson and a boys' basketball coach) by name, Doc. 116-7 at 2, the slide deck did not, instead describing misconduct committed by "students" and "adults," Doc. 116-8 at 6-11.  LeMone presented many of the slides, including some titled "Key Allegations" and "Summary of Allegations."  Doc. 112-6 at 12, 18 (162:11-14, 201:6-10); Doc. 116-8 at 10-11.  Those slides include the heading "Interference with investigations," under which bullet points list allegations such as "Interference with an official investigation by school leadership and staff" and "Withholding evidence from investigative bodies."  Doc. 116-8 at 11.  They also include the heading "Misconduct that harm[ed] students," under which bullet points list allegations such as "Improper evidence gathering and retraumatizing interviews of students," "Failure to provide appropriate support services to students," "Failure to create safety plans for students," and "Dishonesty to families."  *Ibid*.  CPS provided a copy of the slide deck to media outlets. Doc. 134 at ¶ 68.

Members of the high school's Local School Council ("LSC") questioned CPS's handling of Plaintiffs' terminations.  *Id*. at ¶ 69.  Some LSC members accused CPS of acting without a proper basis and raised the idea of conducting an independent investigation.  *Ibid*.  Defendants

believed that the LSC's actions were causing further turmoil in the already agitated school community and sought to ward off a separate investigation. *Id*. at ¶¶ 69-70.

In an attempt to quell the LSC's concerns, CPS officials agreed to attend a confidential meeting with three LSC members. *Ibid*. On February 11, LeMone and other CPS officials provided those members with a summary of the investigation and findings against Thuet and Brumfield. *Id*. at ¶¶ 70-71. CPS officials gave the LSC members a handout—which states that its contents are to remain confidential—summarizing the same information. *Id*. at ¶ 71; Doc. 116-17. The handout asserted that Thuet had, among other things, "[w]ithheld key evidence, violated student safety protocols, mishandled allegations, misled parents involved" and failed to be "candid with investigators." Doc. 116-17 at 5. It also stated that Brumfield was "not honest" with investigators when she claimed to be ignorant of the Detroit trip and had "caused further harm" to C.P. by "ignoring" her Title IX training and violating CPS policy. *Id*. at 6.

The meeting did not remain confidential. On February 13, the *Chicago Sun-Times* published an article titled "Why the Lincoln Park High School administrators were fired." Doc. 1-1 at 2. Citing unnamed sources familiar with the February 11 meeting, the article presented some of CPS's findings against Thuet and Brumfield, which closely mirrored many findings described in the February 11 handout. *Id*. at 6-9; Doc. 134 at ¶ 72.

In addition to relying on the unnamed sources, the *Sun-Times* article directly quoted Michael Passman, CPS's Chief Communications Officer. Doc. 116-11 at 2; Doc. 134 at ¶ 4. Passman's statement read: "Administrators at Lincoln Park High School failed to promote the best interests of their students and endangered victims who were counting on their support. … The personnel actions we have taken were necessary to ensure a school environment that prioritizes the safety of all students, and we are committed to supporting the Lincoln Park High

School community through this challenging time." Doc. 1-1 at 3-4; Doc. 116-11 at 2. Passman

also stated, in reference to the LSC's suggestion that it might initiate its own investigation, that

"[t]oo many adults in the school community are needlessly creating an environment that is

perpetuating the life-altering harm done to multiple students, and they are impeding the

community's ability to heal." Doc. 1-1 at 5; Doc. 116-11 at 2. Dr. Jackson approved Passman's

statement before it was provided to the *Sun-Times*. Doc. 147 at ¶ 28.

The next day, February 14, McDade issued a letter to the school's parents and staff.

Doc. 116-13; Doc. 134 at ¶ 73. Consistent with the February 11 handout and the February 13

*Sun-Times* article, the letter said that "school administrators" had "fostered a dangerous culture

for students," "attempted to minimize the severity of the [sexual misconduct] allegations," and

"withheld key evidence for nearly a week." Doc. 116-13 at 2. The letter further stated that one

administrator had "misled parents of the whistleblowers and falsely claimed that OSP and district

officials had reviewed their child's allegations and considered [them] not troubling." *Ibid*. This

"lack of candor," the letter continued, "jeopardized student safety, especially [for] the students

who came forward to report the allegations, and further traumatized student survivors." *Ibid*.

All this information, the letter said, was "fully substantiated." *Ibid*. Dr. Jackson approved the

letter before it was sent. Doc. 134 at ¶ 61.

After their terminations, Plaintiffs sought new employment. Doc. 147 at ¶¶ 32-33. In

July 2020, Brumfield began working for the Illinois State Board of Education, though she was

fired after two weeks due to her ongoing litigation (this lawsuit) against CPS. *Id*. at ¶ 33;

Doc. 134 at ¶ 78. In July 2021, Brumfield began working as a coordinator of climate, culture,

and community relations for the Rich Township School District. Doc. 134 at ¶ 79; Doc. 147 at

¶ 34. Thuet received one interview for a curriculum writer position, but he could not work in

that role because of his "Do Not Hire" status with CPS schools. Doc. 130-1 at 74-75 (285:15-287:10); Doc. 134 at ¶ 77; Doc. 147 at ¶ 32. Thuet did not obtain a job in education administration or education more broadly, so he switched careers and now works for an e-discovery software firm. Doc. 134 at ¶¶ 76-77; Doc. 147 at ¶ 32.

**Discussion**

Plaintiffs assert a due process claim under the Fourteenth Amendment and state law claims for defamation and intentional infliction of emotional distress.

**I.     Due Process**

Plaintiffs claim that Defendants deprived them of their Fourteenth Amendment occupational liberty interest without due process by firing them and issuing public statements that effectively blacklisted them from comparable positions. Doc. 136 at 12-17. To prevail on that claim, Plaintiffs must show, among other things, that they "had a cognizable liberty interest under the Fourteenth Amendment." *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013) (internal quotation marks omitted). Defendants seek summary judgment on the ground that the record would not permit a reasonable jury to find that Plaintiffs suffered the deprivation of a cognizable occupational liberty interest. Doc. 110 at 9-10.

**A.     Occupational Liberty and the "Stigma Plus" Test**

A public employee's "termination" and an "announcement of the termination" do not themselves infringe a Fourteenth Amendment occupational liberty interest. *Lashbrook v. Oerkfitz*, 65 F.3d 1339, 1349 (7th Cir. 1995). Nor does mere "defamation by a public officer" implicate such an interest. *Olivieri v. Rodriguez*, 122 F.3d 406, 408 (7th Cir. 1997). A public employee's liberty interest may be implicated, however, when the "circumstances of [a] discharge, at least if they were publicly stated, had the effect of blacklisting the employee from

employment in comparable jobs." *Townsend v. Vallas*, 256 F.3d 661, 670 (7th Cir. 2001)

(internal quotation marks omitted). It is the "alteration of legal status"—"such as governmental

deprivation of a right previously held"—in conjunction with an "injury resulting from …

defamation" that may infringe a public employee's due process rights. *Doyle v. Camelot Care

Ctrs., Inc.*, 305 F.3d 603, 617 (7th Cir. 2002) (quoting *Paul v. Davis*, 424 U.S. 693, 708-09

(1976)).

The need for a plaintiff to show both the "alteration of legal status" and "some stigmatic

or reputation injury" is commonly called the "stigma plus" test. *Schepers v. Comm'r, Ind. Dep't

of Corr.*, 691 F.3d 909, 914 (7th Cir. 2012) (quoting *Khan v. Bland*, 630 F.3d 519, 534 (7th Cir.

2010)). To show the impairment of an occupational liberty interest under that test, a plaintiff

must demonstrate that: "(1) he was stigmatized by the defendant's conduct, (2) the stigmatizing

information was publicly disclosed and (3) he suffered a tangible loss of other employment

opportunities as a result of public disclosure." *Townsend*, 256 F.3d at 669-70; *see also Head v.

Chi. Sch. Reform Bd. of Trs.*, 225 F.3d 794, 801 (7th Cir. 2000) (same).

### 1. Stigmatizing Statements

The first component of the test "requires [the plaintiff] to show that a public official made

defamatory statements about [him or her]." *Strasburger v. Bd. of Educ., Hardin Cnty. Cmty.

Unit Sch. Dist. No. 1*, 143 F.3d 351, 356 (7th Cir. 1998). Because the statement must be

defamatory, "statements of opinion" that "do not imply false facts" are not actionable. *Ibid*.

Moreover, the statement must "impugn[] [a plaintiff's] moral character" or imply "dishonesty or

other job-related moral turpitude." *Hedrich v. Bd. of Regents of Univ. of Wis. Sys.*, 274 F.3d

1174, 1184 (7th Cir. 2001) (internal quotation marks omitted); *see also Omosegbon v. Wells*, 335

F.3d 668, 675 (7th Cir. 2003) ("A plaintiff may prove a deprivation of a liberty interest by

10

showing damage to her good name, reputation, honor, or integrity.") (internal quotation marks omitted).

LeMone's January 31 letter mentioned Thuet and Brumfield by name and invited parents to learn about leadership transition plans at a February 3 meeting. Doc. 116-7. At that meeting, LeMone presented a slide deck summarizing allegations of "adult misconduct," including that certain school officials had harmed students, violated school policy, lied to parents, and withheld evidence from investigators. Doc. 116-8 at 10-11. Passman's statement to the *Sun-Times*—for use in an article naming Thuet and Brumfield—can be reasonably understood to convey that Plaintiffs had "endangered" students and caused them "life-altering harm." Doc. 1-1 at 3, 5. And McDade's February 14 letter confirmed much of what unnamed sources had told the *Sun-Times*, including that certain "administrators" had endangered and traumatized students and lied to parents and investigators. Doc. 116-13. Those allegedly false statements, which implied that Plaintiffs had harmed students and were dishonest in their work, satisfy the first prong of the stigma plus test. *See Mann*, 707 F.3d at 878 (allegations of child abuse or neglect); *Hedrich*, 274 F.3d at 1184 (statements that impugn an employee's moral character or honesty).

Defendants maintain that the statements are not defamatory because they are not false. Doc. 110 at 10-11; Doc. 146 at 8-9. At this juncture, the court must view the record in the light most favorable to Plaintiffs. *See Johnson*, 892 F.3d at 893. When doing so, a reasonable jury could find that Plaintiffs had not put any student in danger or lied to any parent or investigator.

Defendants counter that the statements could not have stigmatized Plaintiffs for purposes of the stigma plus test because the statements "related to [their] performance of job duties." Doc. 110 at 10. True enough, a mere "label of incompetence," *Mitchell v. Glover*, 996 F.2d 164, 167 (7th Cir. 1993) (internal quotation marks omitted), or "the announcement of [a]

termination," *Lashbrook*, 65 F.3d at 1349, do not satisfy the stigma plus test.  But the statements here went further by questioning Plaintiffs' honesty and implying that they had put in harm's way students under their care.  Those severe attacks on Plaintiffs' personal character satisfy the test.  *See Mann*, 707 F.3d at 878; *Omosegbon*, 335 F.3d at 675; *Hedrich*, 274 F.3d at 1184.

Defendants observe that not all their statements identified Thuet and Brumfield by name. Doc. 110 at 10.  That fact makes no difference at summary judgment.  Although the slide deck presented at the February 3 meeting mentioned misconduct by "adults," Doc. 116-8 at 6-11, Thuet and Brumfield had just been fired, and the letter advertising the meeting mentioned them by name, Doc. 116-7.  Passman's statements to the *Sun-Times* referred to "administrators," but he knew the article would relate to Plaintiffs, Doc. 116-11 at 2-3, and the article unsurprisingly identified them by name, Doc. 1-1.  Given this context, it is reasonable to infer that the statements "conveyed [Plaintiffs'] identit[ies] to readers who knew them."  *Clark v. Maurer*, 824 F.2d 565, 566 (7th Cir. 1987).

### 2.    Public Disclosure

For the second component of the stigma plus test, Plaintiffs must show that Defendants "actually disseminate[d] the stigmatizing comments in a way that would reach potential future employers or the community at large."  *Palka v. Shelton*, 623 F.3d 447, 454 (7th Cir. 2010). Statements circulated only within the "proper chain of command," *Ratliff v. City of Milwaukee*, 795 F.2d 612, 627 (7th Cir. 1986), or retained in an employee's "personnel file," *Johnson v. Martin*, 943 F.2d 15, 17 (7th Cir. 1991), do not meet the public disclosure requirement. Moreover, the statement must in fact have been made by a defendant.  *See Covell v. Menkis*, 595 F.3d 673, 678 (7th Cir. 2010) (explaining that it must be "a named defendant … who made the disclosure"); *McMath v. City of Gary*, 976 F.2d 1026, 1032 (7th Cir. 1992) ("[O]nly if the

defendants *themselves* published the defamatory material can [a plaintiff] recover for deprivation of [his or her] liberty interest.").

Defendants contend that they did not make stigmatizing statements in connection with the February 3 parent meeting, as Dr. Jackson and Passman did not attend, while LeMone presented only some of the slide deck. Doc. 110 at 10-11. The argument fails because the statements made at the meeting can be attributed to (at least) LeMone and Dr. Jackson. LeMone presented slides summarizing the allegations against Plaintiffs, Doc. 112-6 at 12 (162:11-14); Doc. 134 at ¶ 68, and Dr. Jackson reviewed and approved the deck before it was presented at the meeting and provided to the media, Doc. 112-3 at 68 (118:6-12); Doc. 134 at ¶¶ 61, 68.

As for the February 11 LSC meeting, Defendants contend that the information they conveyed was not a public disclosure because it was shared only with three LSC members and was supposed to remain confidential. Doc. 110 at 11-12. Plaintiffs do not dispute that the February 11 meeting and the handout provided there are akin to an internal circulation that does not qualify as a public disclosure. Doc. 136 at 14-16. It follows that statements made at the meeting and in the handout do not meet the public disclosure requirement. *See Ratliff*, 795 F.2d at 627; *see also Palka*, 623 F.3d at 454 (holding that allegations of criminal conduct relayed to the State's Attorney's office did not meet the public disclosure requirement because "[t]he State's Attorney's Office has an obligation of confidentiality, and there is no allegation that [the allegations] reached potential future employers"). Plaintiffs speculate that the *Sun-Times*'s unnamed sources, who were familiar with the meeting, included at least one of the Defendants. Doc. 136 at 15. But speculation does reasonably permit the inference that Plaintiffs ask the court to draw. *See McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003) ("[W]e are not required to draw every conceivable inference from the record, and mere speculation or conjecture will not

defeat a summary judgment motion.") (citation and internal quotation marks omitted); *McMath*, 976 F.2d at 1034 ("[T]his *res ipsa loquitur*-like approach, while perhaps sufficient to establish that *someone* within city government published the information, does not sufficiently establish that the someone was [one of the defendants].").

Defendants do not challenge the public disclosure requirement as to any other of the statements in question. Thus, the stigma plus test's second component eliminates only statements made at the February 11 meeting, the associated handout, and the *Sun-Times* article's unnamed sources as predicates for Plaintiffs' due process claims.

### 3. Tangible Loss of Employment Opportunities

The third component of the stigma plus test requires Plaintiffs to show that they "suffer[ed] a tangible loss of other employment opportunities as a result of the public disclosure[s]." *Head*, 225 F.3d at 801. To satisfy this component, "the circumstances of [a] termination must make it virtually impossible for the employee to find new employment in [his or her] field." *Lashbrook*, 65 F.3d at 1348-49. This showing may be made with evidence of a "permanent exclusion from or protracted interruption of employment." *Wroblewski v. City of Washburn*, 965 F.2d 452, 456 (7th Cir. 1992). It is the "liberty to pursue a calling or occupation, and not the right to a specific job, that is secured by the Fourteenth Amendment." *Hinkle v. White*, 793 F.3d 764, 767 (7th Cir. 2015) (quoting *Wroblewski*, 965 F.2d at 455); *see also Townsend*, 256 F.3d at 670 n.9 ("[T]he employee must show that, because the charges have been made, it is unlikely that anyone will hire him for a comparable job in the future.").

After her termination, Brumfield applied for approximately 100 jobs. Doc. 147 at ¶ 33. Five applications were for positions in education, and she received interviews for three of them. *Ibid*. In June 2020, about five months after her termination, Brumfield obtained a job with the

Illinois State Board of Education, though she was fired two weeks later due to her involvement in this lawsuit. *Ibid.*; Doc. 134 at ¶ 78. In July 2021, Rich Township School District—which knew about Brumfield's termination and had seen the associated media coverage—hired her in an administrative role as a coordinator of climate, culture, and community about eight months after interviewing her. Doc. 130-42 at 5; Doc. 134 at ¶ 79; Doc. 147 at ¶ 34. She earns a $105,000 annual salary, slightly less than the $108,000 salary she earned at Lincoln Park High School. Doc. 147 at ¶ 34.

Given the delay in Brumfield's job offer from Rich Township, a reasonable jury could find that she experienced some difficulty in her job search due to Defendants' public statements. But given her success in obtaining interviews and two job offers in education, a reasonable jury could not find that she has been excluded from employment comparable to her role at Lincoln Park High School or that it would be virtually impossible for her to obtain such employment. Brumfield therefore cannot satisfy the third component of the stigma plus test, defeating her § 1983 claim.

Thuet experienced far greater difficulties in his job search. After being fired, he applied for approximately 155 jobs. *Id.* at ¶ 32. Fifteen to twenty of those applications were for positions in education administration, but he received no interviews for those positions. *Ibid.* And although he received one interview for a position in education generally, he could not work in that role due to his "Do Not Hire" designation with CPS schools. *Ibid.*; Doc. 130-1 at 74-75 (285:15-287:10); Doc. 134 at ¶ 77. Thuet's sole job offer came in July 2020 from an e-discovery software firm. Doc. 134 at ¶ 76; Doc. 147 at ¶ 32. Based on his difficulty in securing even interviews for a comparable position in education administration, a reasonable jury could find

that Defendants' public statements excluded him—or, at a minimum, made it virtually impossible for him to obtain—such employment.

Pressing the contrary result, Defendants note that Thuet filed this suit and spoke to the media—including the *Chicago Tribune*, a radio station, and a television station—just a month after being fired. Doc. 110 at 13; Doc. 134 at ¶ 75. The argument, it seems, is that Defendants' public statements could not have impacted Thuet's employment prospects because he publicized his own firing. Although Defendants' point might hold sway with a jury, the causation issue is not beyond dispute. For example, a jury might reasonably find that Defendants' statements were so widespread and stigmatizing that Thuet's publicization of his situation did not add to the damage. Indeed, a jury might reasonably find that Thuet's press tour mitigated the impact of Defendants' statements by allowing him to tell his side of the story.

In sum, the evidence is sufficient to establish all three components of the stigma plus test as to Thuet's claim. *See Mann*, 707 F.3d at 878. The evidence does not satisfy the stigma plus test as to Brumfield, so Defendants are granted summary judgment on her § 1983 claim.

## B. Defendant Liability

Defendants maintain that, even if Thuet suffered a deprivation of his occupational liberty interest, they cannot be held liable under § 1983. Doc. 110 at 6-9. The standards for liability under § 1983 differ for the individual defendants (Dr. Jackson, LeMone, and Passman) and the Board, so they are considered separately.

### 1. Individual Defendants

"Section 1983 creates a cause of action based on personal liability and predicated upon fault." *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996). To hold a government official liable under § 1983, "a plaintiff must establish that a defendant was personally responsible for the

16

deprivation of a constitutional right." *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). This requirement is satisfied if an official "cause[s] or participate[s] in a constitutional deprivation," *Vance*, 97 F.3d at 991 (internal quotation marks omitted), or, as a supervisor, "knowingly facilitates, approves, or condones constitutional violations carried out by [his or her] subordinates," *Milchtein v. Milwaukee Cnty.*, 42 F.4th 814, 824 (7th Cir. 2022).

The record would allow a reasonable jury to find that Dr. Jackson, LeMone, and Passman are personally responsible for a deprivation of Thuet's occupational liberty interest. Passman made statements to the *Sun-Times* for an article that he knew concerned Thuet's termination, Doc. 147 at ¶ 28; LeMone presented a slide deck explaining the allegations underlying the termination, Doc. 134 at ¶ 68; and Dr. Jackson approved her subordinates' messaging concerning the termination, *ibid.*; Doc. 147 at ¶ 28. The individual defendants' only counterargument is that the evidence cannot establish that they were the *Sun-Times*'s unnamed sources. Doc. 110 at 8. But that the individual defendants may not have been responsible for *every* allegedly defamatory statement about Thuet's termination does not mean that they cannot be held liable for the statements that LeMone and Passman did make or that Dr. Jackson did approve.

Dr. Jackson, Passman, and LeMone argue in the alternative that they are entitled to qualified immunity. *Id.* at 8-9. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Figgs v. Dawson*, 829 F.3d 895, 905 (7th Cir. 2016) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "When confronted with a claim for qualified immunity, [the court] must address two questions: whether the plaintiff's allegations make out a deprivation of a constitutional right,

and whether the right was clearly established at the time of defendant's alleged misconduct."
*McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010).

Thuet invokes the right to be free of defamatory statements made in conjunction with his termination as a public school principal that left him effectively blacklisted from obtaining comparable employment. The Seventh Circuit has held that it has been "clearly established," since 1988 at the latest, that a public employee's occupational liberty interest is implicated "when the government terminates a public employee and makes false or substantially inaccurate public charges or statements that stigmatize the employee." *McMath*, 976 F.2d 1031; *see also Strasburger*, 143 F.3d at 356 (collecting cases decided between 1986 and 1997 recognizing the right). Circuit precedent is also clear that the right extends to public school employees. *See Head*, 225 F.3d at 801 (elementary school principal); *Strasburger*, 143 F.3d at 356 (high school teacher and athletic director).

The individual defendants emphasize that they made or approved the allegedly defamatory statements in response to numerous inquiries from the public. Doc. 110 at 9. That parents and the media were curious about the reasons for Plaintiffs' terminations may explain why Defendants wanted to release certain statements. But it says nothing about whether doing so violated Plaintiffs' clearly established rights.

The individual defendants also maintain that they relied upon "reliable information" from their investigators in making or approving the statements. *Ibid*. The argument seems to be that any misstatements were the result of understandable mistakes. True enough, qualified immunity applies to a reasonable "mistake of fact" just as well as a "mistake of law." *Mordi v. Zeigler*, 770 F.3d 1161, 1163 (7th Cir. 2014) (quoting *Pearson*, 555 U.S. at 231); *see also Butz v. Economou*, 438 U.S. 478, 507 (1978) ("[O]fficials will not be liable for mere mistakes in

judgment, whether the mistake is one of fact or one of law."). The individual defendants, however, do not identify the reliable information on which they relied or why they acted reasonably in so relying. They instead cite in bulk to sixty-one paragraphs of their Local Rule 56.1(a)(2) statement. Doc. 110 at 9 (citing Doc. 111 at ¶¶ 10-53, 57-71, 73-74). Their argument is underdeveloped and therefore forfeited. *See M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority.").

In any case, whether Dr. Jackson, LeMone, and Passman had grounds to believe they were relying on "reliable information" is a matter of reasonable debate. While qualified immunity is a question of law for the court, *see Smith v. Finkley*, 10 F.4th 725, 734 (7th Cir. 2021), the facts at this stage must be viewed in the light most favorable to Thuet, *see Leiser v. Kloth*, 933 F.3d 696, 700 (7th Cir. 2019) (considering whether "the defendants were entitled to qualified immunity when viewing the facts in the light most favorable to [the plaintiff]"). On the summary judgment record, a reasonable jury could find that Dr. Jackson, LeMone, and Passman did not have the grounds necessary to have confidence in the truth of their statements. Accordingly, they are not entitled to qualified immunity.

### 2. The Board

Under *Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978), a municipality cannot be held liable for its employees' constitutional violations based on a *respondeat superior* theory. Instead, a municipality may be liable "only for conduct that is properly attributable to the municipality itself." *Milchtein*, 42 F.4th at 826 (internal quotation marks omitted). To ensure that this limitation is observed, a plaintiff must show that "a government's policy or custom" is responsible for the constitutional injury, *Monell*, 436 U.S. at 694, and "that [the] official policy

or custom not only caused the constitutional violation, but was the moving force behind it,"
*Estate of Sims ex rel. Sims v. Cnty. of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007) (internal
quotation marks omitted).  The government policy or custom may come in the form of "(1) an
express municipal policy; (2) a widespread, though unwritten, custom or practice; or (3) a
decision by a municipal agent with 'final policymaking authority.'"  *Milestone v. City of
Monroe*, 665 F.3d 774, 780 (7th Cir. 2011); *see also Rice ex rel. Rice v. Corr. Med. Servs.*, 675
F.3d 650, 675 (7th Cir. 2012) (same).

Thuet premises the Board's *Monell* liability on the theory that Dr. Jackson was a final
policymaker as to the Board's public statements regarding his termination.  Doc. 136 at 9.  The
Board concedes that Dr. Jackson was an individual with final policymaking authority and that
she approved all public statements regarding the termination.  Doc. 110 at 6.  That is enough for
municipal liability to attach under *Monell*.  Dr. Jackson approved the statements on the Board's
behalf, "automatically" making them "actions of the [Board] itself under § 1983."  *Bradley v.
Vill. of University Park*, 929 F.3d 875, 885 (7th Cir. 2019).  Put differently, the statements are
the Board's statements for purposes of § 1983 because Dr. Jackson "sanctioned or ordered"
them.  *Fittshur v. Vill. of Menomonee Falls*, 31 F.3d 1401, 1410 (7th Cir. 1994); *see also Rasche
v. Vill. of Beecher*, 336 F.3d 588, 598 & n.11 (7th Cir. 2003) (explaining that the filing of a
lawsuit was an act of a village where the village's board of trustees authorized the suit).

Pressing the contrary result, the Board contends that it can be liable for Dr. Jackson's
conduct only if she acted with "deliberate indifference" to the consequences of her conduct.
Doc. 110 at 6.  That argument misapprehends *Monell* liability.  Where a "municipality has not
directly violated [a plaintiff's] rights but rather has caused an employee to do so," the plaintiff
must show that the that the municipality's action "was taken with 'deliberate indifference' to

20

[his] constitutional rights." *First Midwest Bank v. City of Chicago*, 988 F.3d 978, 986-87 (7th Cir. 2021) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997)). Under such circumstances, the deliberate indifference requirement "avoid[s] collapsing municipal liability into the respondeat superior liability forbidden in *Monell*" by allowing a municipality to be held liable only where it was "culpable or at fault for the violation." *Milchtein*, 42 F.4th at 826. But that principle has no purchase where, as here, there is evidence that a municipality is directly culpable through the acts of a final policymaker. *See First Midwest Bank*, 988 F.3d at 986 ("When a municipality takes action or directs an employee to take action that facially violates a federal right, municipal fault is easily established."). In other words, in the present circumstances, there is no need to ask whether Dr. Jackson was deliberately indifferent, as her status as an official policymaker necessarily means that the Board acted deliberately. *See J.K.J. v. Polk Cnty.*, 960 F.3d 367, 378 (7th Cir. 2020) (en banc) (explaining that a municipality's "[d]eliberate conduct is easily inferred from the intentional adoption of the offending policy").

Accordingly, the evidence allows Thuet's § 1983 claim against the Board to survive summary judgment.

## II.    State Law Claims

Plaintiffs assert state law claims for defamation and intentional infliction of emotional distress ("IIED"). Defendants maintain that the evidence is insufficient to prove either claim. Doc. 110 at 14. Dr. Jackson, LeMone, and Passman—but not the Board—additionally contend that they are immune from liability under the Illinois Tort Immunity Act. *Id.* at 15.

The Illinois Tort Immunity Act provides in pertinent part that "[a] public employee acting in the scope of his [or her] employment is not liable for an injury caused by his negligent misrepresentation *or* the provision of information either orally, in writing, by computer or any

21

other electronic transmission, or in a book or other form of library material." 745 ILCS 10/2-210 (emphasis added). The individual defendants claim immunity based on Section 2-210's "provision of information" component, which, the Appellate Court of Illinois has explained, is "a separate category" from the immunity attaching to "negligent misrepresentation." *Goldberg v. Brooks*, 948 N.E.2d 1108, 1114 (Ill. App. 2011).

To establish immunity under the provision of information category, a defendant must "show that (1) [he or] she was a public employee who (2) provided information while (3) acting within the scope of [his or] her employment." *Masters v. Murphy*, 176 N.E.3d 911, 916 (Ill. App. 2020). Section 2-210's text does not expressly limit the causes of action to which "provision of information" immunity may apply, and authority supports the statute's application to defamation and IIED claims. *See id.* at 916-17 (defamation); *Goldberg*, 948 N.E.2d at 1114-15 (defamation); *Strack v. Morris*, 2012 WL 7051309, at *5 (Ill. App. Oct. 4, 2012) (IIED); *In re Est. of Lambie*, 2012 WL 7017620, at *5 (Ill. App. Mar. 8, 2012) (IIED). *But see Logan v. City of Evanston*, 2020 WL 6020487, at *9 (N.D. Ill. Oct. 12, 2020) (holding that Section 2-210 applies to IIED claims but not intentional defamation claims). In any case, Plaintiffs do not dispute that the immunity can apply to their defamation and IIED claims. Doc. 136 at 20-21.

Nor do Plaintiffs dispute that the three elements of "provision of information" immunity under Section 2-210—that Dr. Jackson, LeMone, and Passman were public employees who provided information while acting within the scope of their employment—are met. *Ibid*. Instead, Plaintiffs argue that Section 2-210 does not immunize "willful and wanton conduct," which they suggest Defendants engaged in here. *Ibid*. In support, Plaintiffs cite *Jane Doe-3 v. McLean County Unit District No. 5 Board of Directors*, 973 N.E.2d 880, 893 (Ill. 2012), where the plurality opinion (endorsed by three of the seven justices of the Supreme Court of Illinois)

considered whether Section 2-210's "negligent misrepresentation" immunity covered "willful and wanton" conduct. The opinion explained that a statutory exception for willful and wanton conduct may be (a) stated "expressly" or (b) implied "negatively" by providing that the immunity applies only to "negligent" conduct. *Ibid*.

Under this rubric, Section 2-210's immunity for "*negligent* misrepresentation" implies that such immunity does not cover willful and wanton conduct. *Id*. at 894. But, as noted, Section 2-210's "negligent misrepresentation" component is distinct from its "provision of information" component. And the Appellate Court of Illinois has persuasively explained that the word "negligent" in the key portion of the statute—"negligent misrepresentation *or* the provision of information" (emphasis added)—has no effect after the "or." *See Goldberg*, 948 N.E.2d at 1114. One justice writing separately in *Jane Doe-3* made the same point, observing that the plurality opinion had not addressed Section 2-210's "provision of information" component, and (echoing the state appellate court in *Goldberg*) explaining that "there is no 'negligent' modifier" when "the conduct at issue is provision of information." *Jane Doe-3*, 973 N.E.2d at 903-04 (Garman, J., concurring in part and dissenting in part).

Plaintiffs therefore are wrong to argue that Section 2-210's "provision of information" component cannot immunize willful and wanton conduct. *See Logan*, 2020 WL 6020487, at *9 (reaching the same conclusion); *see also Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 921 (7th Cir. 2015) ("There is no willful and wanton exception for provisions of the [Illinois Tort Immunity] Act that do not expressly contain such an exception."); *Jane Doe-3*, 973 N.E.2d at 893 ("[W]here a provision of the Tort Immunity Act contains no exception for willful and wanton conduct, we will not read one in."). *But see Jones v. Lake Cnty. Sheriff's Off.*, 2021 WL 1387908, at *2 (N.D. Ill. Apr. 13, 2021) (reaching the opposition conclusion).

To be clear, Plaintiffs do not argue that Defendants' statements are "misrepresentations" falling under Section 2-210's "negligent misrepresentation" component and thus arguably subject to a willful and wanton conduct exception. Doc. 136 at 20-21. Nor do they explain why Section 2-210's "provision of information" component would not remain an independent bar to their claims even if Defendants' statements could also be construed as "misrepresentations." Consequently, Plaintiffs forfeit any such arguments, *see Nichols v. Mich. City Plant Plan. Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment."), and Section 2-210 precludes Dr. Jackson's, LeMone's, and Passman's liability for the defamation and IIED claims.

That leaves the IIED claim against the Board. (As noted, the court has dismissed the defamation claim against the Board. 2020 WL 5702195, at *4.) The Board does not argue that it has immunity under Section 2-210 or any other statute or doctrine, nor does it contend that it cannot be liable on a respondeat superior theory (or any other liability theory), so its only argument is that Plaintiffs have not adduced sufficient evidence to prove their IIED claim. Doc. 110 at 13-15.

To prevail on an IIED claim, a plaintiff must establish (1) that the defendants' conduct was "truly extreme and outrageous," (2) that the defendants "intend[ed] that [their] conduct inflict severe emotional distress, or kn[e]w that there [was] at least a high probability that [their] conduct [would] cause severe emotional distress," and (3) that "the conduct … in fact cause[d] severe emotional distress." *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988) (emphasis omitted); *see also Lopez v. City of Chicago*, 464 F.3d 711, 720 (7th Cir. 2006) (same). "[T]he nature of the defendant's conduct must be so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized community." *Feltmeier v. Feltmeier*, 798

24

N.E.2d 75, 83 (Ill. 2003); *see also Lewis v. Sch. Dist. # 70*, 523 F.3d 730, 747 (7th Cir. 2008) (same).

The Board contends that Plaintiffs' IIED claims fail because "there is no evidence that Defendants intended to inflict emotional distress." Doc. 110 at 14. As noted, it is enough under Illinois law that a defendant "knew there was at least a high probability" that its conduct would inflict severe emotional distress. *Lopez*, 464 F.3d at 720. Here, there is evidence sufficient for a reasonable jury to find that Defendants falsely and publicly accused Plaintiffs of lying to parents regarding sexual misconduct, endangering and traumatizing students, and facilitating a cover up. A jury could reasonably conclude that Defendants knew there was at least a high probability that such accusations could cause Plaintiffs—who had built successful careers in education—to suffer severe emotional distress. *See Prakash v. Parulekar*, 177 N.E.3d 1, 16-17 (Ill. App. 2020) (holding that a professor's false statements that another professor had fraudulently misused federal funding were sufficient to state an IIED claim); *Brown v. Kouretsos*, 2016 WL 3269000, at *5 (N.D. Ill. June 15, 2016) (holding that a principal's allegedly false accusation that a teacher had smoked marijuana on school property stated an IIED claim); *see also Day v. Buckham*, 2021 WL 5050288, at *4 (N.D. Ill. Nov. 1, 2021) (determining that an allegedly false claim of sexual abuse of a child was sufficient to state an IIED claim).

The Board points out that Illinois courts hesitate to permit IIED claims in the employment context. Doc. 110 at 14. True enough, Illinois law holds that "everyday job stresses should not give rise to a cause of action for intentional infliction of emotional distress." *Vickers v. Abbott Lab'ys*, 719 N.E.2d 1101, 1115 (Ill. App. 1999). The fear is that "nearly every employee would have a cause of action" if "everyday job stresses resulting from discipline, personality conflicts, job transfers or even terminations" could establish an IIED claim. *Naeem*

*v. McKesson Drug Co.*, 444 F.3d 593, 605 (7th Cir. 2006) (quoting *Graham v. Commonwealth Edison Co.*, 742 N.E.2d 858, 867 (Ill. App. 2000)). This hesitancy is overcome, however, where a defendant's conduct "go[es] well beyond the parameters of the typical workplace dispute." *Lewis*, 523 F.3d at 747 (internal quotation marks omitted); *see Naeem*, 444 F.3d at 606 (holding that a manager's extreme demands on a pregnant employee could support an IIED claim). Publicly and falsely accusing school administrators of endangering students and lying to parents and investigators is not an "everyday job stress," *Vickers*, 719 N.E.2d at 1115, or a "typical workplace dispute," *Lewis*, 523 F.3d at 747.

The Board does not argue that its (or its employees') conduct was not extreme or outrageous, nor does it argue that their conduct did not cause Plaintiffs to suffer severe emotional distress. Doc. 110 at 14. Plaintiffs' IIED claims against the Board accordingly survive summary judgment.

### Conclusion

Defendants' summary judgment motion is granted as to Plaintiffs' state law claims against Dr. Jackson, LeMone, and Passman, and as to Brumfield's § 1983 claim. The motion is denied as to, and will proceed to trial on, Thuet's § 1983 claim against all Defendants and Plaintiffs' IIED claims against the Board.

October 7, 2022

_____
United States District Judge

26